# State *v*. McCarty.

### *Violating Cattle Quarantine Regulation.*

(Decided May 7, 1912. Rehearing denied June 5, 1912.
59 South. 543.)

1. *Appeal and Error; Appeal by State; Review.*—Under section 6246, Code 1907, the Appellate Court cannot consider the sufficiency of the affidavit and warrant upon which the defendant was arrested, or any question other than a constitutional one, where the appeal is by the State.

2. *Constitutional Law; Construction.*—The Constitution must be interpreted so as to carry out the general principles of government, and should not be given a technical construction which will defeat them.

3. *Same; Construction of Statutes.*—All doubt will be resolved in favor of the constitutionality of a statute, thus putting the burden of showing its unconstitutionality upon the objector.

4. *Same.*—In determining the constitutionality of the State Stock Quarantine Law, great latitude is allowed the legislature in determining its character, and the manner of its administration.

5. *Same; Delegation of Legislative Power; Quarantine.*—Sections 707-770, Code 1907 (Acts 1907, p. 13, as amended by Acts 1907, p. 582), establishing a live stock sanitary board, and empowering it to make rules and regulations, is a grant of authority to an arm of the state, to prescribe rules under which the law can be effectively administered, and is not an unconstitutional delegation of the law making power.

6. *Same.*—Section 765, Code 1907, is not unconstitutional because it leaves the State Live Stock Board to determine when it is best that the work of cattle tick eradication shall be taken up in any locality.

7. *Animals; Quarantine; Powers of State.*—Under its police powers the state may prescribe stock quarantine regulations and punishment for their violation, and may require its citizens to disinfect their stock at their expense.

8. *Same; Validity of Statute.*—The fact that section 765, Code 1907, authorizes the Court of County Commissioners to supplement out of the funds of the county, the fund provided by law for cattle tick eradication does not affect the validity of sections 757 to 770 inclusive, Code 1907.

APPEAL from Sumter County Court.

Heard before Hon. P. J. JARMAN.

J. W. McCarty was charged with violating the State
Live Stock Sanitary Board's regulations relative to
stock quarantine. A demurrer was sustained to the
warrant and affidavit on constitutional grounds, and
the state appeals. Reversed and remanded.

R. C. BRICKELL, Attorney General, and W. L. MAR-
TIN, Assistant Attorney General, for the State. The
Appellate Court is limited to a consideration of the
constitutional questions involved.—*State v. Street*, 117
Ala. 203; Section 6246, Code 1907. The acts in ques-
tion is not violative of any constitutional provision, nor
does section 7083, Code 1907, as amended by Acts 1909,
p. 248, violate any constitutional provision.—*Henge-
hold v. State*, 108 Ky. 752; Section 400, Fed.
St. Ann.; *Isenhour v. The State*, 157 Ind. 517; *City of
N. O. v. Charaulcau*, 15 A. & E. Ann. cases, 46; *Fisher
v. St. Louis*, 194 U. S. 361; *State v. Thompson*, 54 L. R.
A. 950; *Bishop v. The State*, 127 S. W. 698; *Garrett v.
The State*, 49 N. J. L. 94; *Overshiner v. The State*, 156
Ind. 187.

SPROTT & BROCKAWAY, and J. M. FOSTER, for appel-
lee. The power conferred on the legislature to make
laws cannot be delegated by that department to any
other body or department.—*Mitchell v. State, ex rel.
Florence*, 134 Ala. 392; *Schultes v. Eberly*, 82 Ala. 242.
The act is unconstitutional because it is arbitrary.—
29 L. R. A. 53. As to what is administrative and what
is not, see *State of Minnesota v. Great Northern Rail-
way*, 10 L. R. A. 250. The law is not put in force by the
legislative will, but if put in force must be at the will
of the commission or of the county commissioners'
court.—Section 765, Code 1907; Acts 1909, p. 187. This
section and the amendment thereto are unconstitutional

and void and an attempt to substitute the will of the boards therein mentioned for the will of the legislature. —*Mitchell v. The State, ex rel. supra;* 75 Atl. 455; 70 N. W. 347; 65 N. W. 738.

DE GRAFFENRIED, J.—In this proceeding the constitutionality of the act of the Legislature establishing a State Live Stock Sanitary Board, approved March 12, 1907 (Laws 1907, p. 413), as amended by an act approved August 6, 1907 (Acts 1907, p. 582), which now appears as sections 757 to 770 of the Code, inclusive, is presented to us for our consideration. The section of the Code under which this appeal is taken—section 6246—limits the decision of this court to the constitutionality of the statute drawn in question, and to the consideration of that question alone. On this appeal we have nothing to do with the question as to the sufficiency vel non of the affidavit and warrant upon which the defendant was arrested.—*State v. Street et al.,* 117 Ala. 203, 23 South. 807.

There are certain powers which necessarily belong to all governments, and without which a government can no more exist than a man can exist without lungs. "A Constitution is not to receive a technical construction, like a common-law instrument or statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them."—*Hamilton v. St. Louis County Ct.,* 15 Mo. 23; *Dorman v. State,* 34 Ala. 216.

The fourteenth amendment to the Constitution of the United States, "broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed its 'police power,' to prescribe *regulations* to promote the health, peace, morals, education, and good order of the people,

develop its resources, and add to its wealth and prosperity."—*Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923.

It cannot be denied that the motive which prompted the Legislature in placing these statutes in our Code of Laws was wise and beneficent; nor can it be claimed that the Legislature, in creating this law, did so with any covert purpose to contravene and set at naught any of the laws of the federal government. Provision is made in this law for harmonious action on the part of both the federal and state officials, in the effort, on the part of both the federal authorities and the state, through scientific experts, to control, minimize, and, if possible, stamp out communicable diseases to which stock are subject. "In every well-ordered state, property is held subject to the tacit condition that it shall be so used as not to injure the equal rights of others. Such injurious uses of property may be prevented by such regulations and restraints as the Legislature may think proper to impose; and in the establishment of these the only limits to the legislative authority which we can recognize are those which are declared by the fundamental law."—*Ingram v. State,* 39 Ala. 247, 84 Am. Dec. 782.

In pursuance of a policy which it deemed wise and calculated to promote the interests of an important industry to which we have above referred, the Legislature, through the above provisions of the Code, called into existence the Live Stock Sanitary Board, investing it with certain powers which it deemed necessary for the maintenance of the health of live stock and the prevention of contagious diseases with which cattle and other live stock are liable to be affected.

Recognizing the patent fact that to attempt to prescribe rules which could apply to all sections, cover all

contingencies, and relate to all the multitudinous administrative details of the system thus formulated would be to attempt that which, in view of the nature of the subject, was impossible, the Legislature, in section 758 of the Code, empowered the State Live Stock Sanitary Board to make such rules and regulations as they might deem necessary for governing the movement, transportation, or disposition, not of *all* live stock, but of live stock that might be *quarantined* under the provisions of the law, and in section 763 of the Code, requires the owners, renters, or parties in possession of quarantined live stock or quarantined places to obey the directions contained in the rules and regulations of the State Live Stock Sanitary Board in cleaning and disinfecting infected live stock and infected or quarantined places, and also requires them to cleanse and disinfect such live stock and places within a reasonable time after receiving notice from the Live Stock Board to do so. In section 7083 of the Code, punishment is provided, among other things, for "failing or refusing, without just cause and legal excuse, to cleanse and disinfect any infested or infected place in which live stock are kept, when requested or directed by the State Live Stock Board, the state veterinarian or his assistants, to do so."

The appellee was arrested on a warrant issued on an affidavit charging him with a violation of said section 7083 of the Code. His demurrer to the affidavit, attacking the constitutionality of the above-mentioned sections of the Code, from section 757 to section 770, inclusive, was sustained by the trial court, and the state appeals. The constitutionality of the above sections of the Code, as already stated, is the only question presented by the record, and is the only question which we are authorized to consider on this appeal.

Both principle and authority abundantly sustain the propriety—the necessity—of such legislation in general, and the validity of the legislative enactments now under consideration.

Legislation of this character is simply a legislative exercise of the police power of the state, a power without which, as we have already said, no enlightened state can exist. It cannot be denied that the state, out of necessity, has the undoubted power to provide by law for a quarantine of cattle afflicted with a contagious disease, and the unquestioned power to render such legislation effective of the purpose sought to be attained, by providing punishment for those who violate such law. Neither can it be questioned that the state also has the power to require its citizens, at their expense, to disinfect their diseased or infested live stock or infected places.—*Morgan's Steamship Co. v. Louisiana Board of Health,* 118 U. S. 455, 6 Sup. Ct. 114, 30. L. Ed. 237.

In the above article 4 of chapter 22 of the Code (sections 757 to 770, inclusive), the state has, through unquestionable constitutional channels, provided a system dealing with the preservation of the health of live stock and their protection from contagious diseases as fully as was within the scope of legislative vision at the time of the passage of those laws. Realizing that conditions would naturally and in all probability arise which could not then be foreseen, and that the administration of the law was one coming peculiarly within the province of scientific experts, the Legislature, out of necessity, wisely left to the members of the board the making of such rules as would promote the *efficient administration* of the law; and *itself* provided, in section 7083, a spur for the observance of the law. If the appellee is guilty in this case, and is punished under this affidavit, he will be punished by the will and com-

mand of the Legislature of Alabama, and not by the
will or command of the Live Stock Sanitary Board, or
any of its members, or of any other authority.

Whenever the validity of an act is challenged, upon
the ground that it is unconstitutional, the objector as-
sumes the burden of showing that it is an exercise of
authority, not legislative in its nature, or that it is in-
consistent with some other provision of the Constitu-
tion. In cases of doubtful construction, the doubt
should be resolved in favor of the constitutionality of
the act.—*Ingram v. State,* 39 Ala. 247, 84 Am. Dec. 782;
*Dorman v. State,* 34 Ala. 216; *Whaley v. State,* 168 Ala.
152, 52 South. 941, 30 L. R. A. (N. S.) 499.

By an act entitled an act "to prohibit the distillation
of grain in the state of Alabama, except under the di-
rection and authority of the Governor," approved De-
cember 8, 1862 (Acts 1862, p. 43), it was provided that
"it shall not be lawful, during the existing war, to dis-
till, or convert into spirituous or intoxicating liquor
any grain, or the product of any grain, unless hereafter
employed or authorized by the Governor to do so." An-
other section of the same act provided that it should
be the duty of the Governor, "under *such rules and reg-*
*ulations as he may prescribe,* to cause such an amount
of grain to be distilled, or converted into alcohol or spir-
ituous liquors, as in his judgment is consistent with the
common defense and the general welfare." In the case
of *Ingram v. State, supra,* the constitutionality of said
act was attacked upon the same grounds now made the
basis of the attack upon the act now under considera-
tion; and in that case the Supreme Court said: "The
objection that the act is invalid, because it transfers leg-
islative power to the Governor, is not well taken. The
Governor is simply the agent, appointed by the Legis-
lature, to carry out the provisions of the law. He, it is

true, is intrusted with a large discretion in the exercise
of the powers conferred upon him; but we are unable
to see upon what principle this feature of the law can
be held to invalidate it." The excerpt, above quoted,
from the decision of the Supreme Court in *Ingram v.
State, supra,* is but a recognition by our Supreme Court
of the well-established doctrine that, while the Legisla-
ture cannot delegate its power to make a law, it *can
make a law* to delegate a power to determine some fact
or state of things upon which the law makes or intends
to make *its own* action depend. "To deny this would
be to *stop* the *wheels* of government. There are many
things upon which wise and useful legislation must de-
pend, which cannot be known by the lawmaking power,
and need, therefore, be a subject of inquiry and deter-
mination outside of the halls of legislation."—*Locke's
Appeal,* 72 Pa. 491, 13 Am. Rep. 716.

The case of *Whaley v. State,* 168 Ala. 152, 52 South.
941, 30 L. R. A. (N. S.) 499, is conclusive on the sub-
ject under discussion. In that case the Supreme Court
considered the validity of the statute authorizing street
car companies to make rules and regulations governing
the disposition of transfer tickets, and providing a pun-
ishment for the violation of such rules. Some of the
Justices taking part in the decision of the case dissent-
ed from the conclusion of the court that the act was
valid, on the ground that, while the authority granted
to a subordinate governmental agency to make rules
and regulations, the violation of which should be a
crime, was within legislative power, the grant in that
case was not to such subordinate governmental agency,
but to a *private* corporation. In the instant case, under
the statutes now under consideration, the authority is
conferred, not upon a private corporation, but on an
*arm* of the state *itself,* and the authority conferred is,

*not to make a law,* but to provide rules under which the law can be efficiently and effectively administered by that governmental agency.

In considering an act authorizing the State Board of Health to make rules and regulations concerning the pure food and drug act of the state of Indiana, the Supreme Court of that state, upholding the act against an attack similar to that here, said, in *Isenhour v. State,* 157 Ind. 517, 62 N. E. 40, 87 Am. St. Rep. 228: "This class of legislation emanates from an exercise of the police power of the state for the protection of the public health. The power of the Legislature, and its right to determine for itself when an emergency for such legislation exists, and the means and instrumentalities necessary to accomplish the end in view, is no longer a doubtful question. The particular character of the subject, embodying, as it does, considerations of sanitary science, is such as to require for just legal control something more than legislative wisdom to accurately designate the subjects and instances intended to be affected. The classification of these subjects and the prescribing of rules by which they may be determined by a qualified agent, is *not legislation,* but merely the exercise of administrative powers. The *law itself* is perfect and effective in all its parts. In respect to the matters to be determined by the State Board of Health in its execution, it awaits the performance of those duties. When *performed,* the *law operates* upon the things done by the board. While unperformed, the law remains ready to be applied whenever the preliminary condition exists. It is said in *Blue v. Beach,* 155 Ind. 121, 56 N. E. 89 [50 L. R. A. 64, 80 Am. St. Rep. 195]: 'In order to secure and promote the public health, the state creates boards of health as an instrumentality or agency for that purpose, and invests them with the power to adopt

ordinances, by-laws, rules and regulations necessary to secure the objects of their organization. While it is true that the character or nature of such boards is administrative only, still the powers conferred upon them by the Legislature, in view of the great public interest confided to them, have always received from the courts a liberal construction; and the right of the Legislature to confer upon them the power to make reasonable rules, by-laws, and regulations is generally recognized by the authorities.' "

While a legislative body cannot delegate its legislative power to make a law, it may delegate the power to an arm of the government to make and enforce regulations for the execution of a statute according to its terms.—*Union Bridge Co. v. U. S.*, 204 U. S. 364, 27 Sup. St. 357, 51 L. Ed. 523; *St. Louis Merchants' Bridge Terminal Co. v. U. S.*, 188 Fed. 191, 110, C. C. A. 63.

"The true distinction," said Judge Ranney for the Supreme Court of Ohio, in *Cincinnati, Wilmington & Zanesville R. R. Co. v. Commissioners*, 1 Ohio St. 77, 88, in a declaration which, according to Sanborn, Circuit Judge, in *St. L. Mer. Bridge Ter. R. R. Co. v. U. S.*, supra, has been repeatedly upheld by the Supreme Court of the United States, "is between a delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made."

The members of the Live Stock Board can pass rules and regulations governing the subjects named in article 4 of chapter 22 of the Code, because the Legislature, by properly enacted legislation, has willed that they shall have that power; and, as we have already said, if the

defendant is convicted, it will not be because of the *will* of the members of the Live Stock Board, but because of the legislative *will* duly expressed in statutes evidencing that will.

The validity of such statutes, says the Supreme Court of Massachusetts, has been long recognized, and may be upheld upon one or both of two grounds: "They may be considered as being within the principle of local self-government as to such matters; the board of health being treated as properly representing the inhabitants in making regulations, which often are *needed* at *short* notice, and which could not well be made, in all kinds of cases, by the voters in town meeting assembled. Perhaps some of these statutes may also be justified constitutionally, on the ground that the work of the board of health is only a determination of *details* in the nature of *administration*, which may be by a board appointed for that purpose; and that the *substantive* legislation is that part of the statute which *prescribes a penalty* for the disobedience of the rules which they make as agents performing executive and administrative duties."— *Broadbine v. Revere,* 182 Mass. 598, 66 N. E. 607. See, also, *Hurst v. Warner,* 102 Mich. 238, 60 N. W. 440, 26 L. R. A. 484, 47 Am. St. Rep. 525; *In re Griner,* 16 Wis. 427; *Eureka Harbor Com'rs. v. Excelsior Power Co.,* 88 Cal. 491, 26 Pac. 375, 22 Am .St. Rep. 321; *People v. Bellinger,* 145 App. Div. 141, 129 N. Y. Sup. 92.

In the case of *Pierce v. Doolittle,* the Supreme Court of Iowa said, through McClain, C. J., that a statute (Code 1897, § 2573) providing punishment for a violation of a regulation of the State Board of Health is not unconstitutional, on the theory that legislative power to create crimes is thereby delegated to such board. "When these boards duly adopt rules or by-laws by virtue of legislative authority, such rules and by-laws,

within the respective jurisdictions, have the force and effect of the law of the Legislature; and, like the ordinance or by-law of a municipal corporation, they may be said to be in force by authority of the state."—*Pierce v. Doolittle,* 130 Iowa, 333, 106 N. W. 751, 6 L. R. A. (N. S.) 143. See, further, on this subject *State v. Rasmussen,* 7 Idaho, 1, 59 Pac. 933, 52 L. R. A. 78, 97 Am. St. Rep. 234.

The above case of *State v. Rasmussen* was, by writ of error, taken to the Supreme Court of the United States and in that case the Supreme Court, through Mr. Justice Brewer, said, in substance, that "the Idaho sheep quarantine act of March 13, 1899, authorizing the Governor, when he has reason to believe that there is an epidemic infectious disease of sheep in localities *outside* of the state, to investigate the matter, and, if he finds that the disease exists, to make a proclamation declaring such localities infected, and prohibiting the introduction therefrom of sheep into the state, *except under such restrictions as,* after consultation with the state sheep inspector, he may declare proper, is within the police power of the state, and is not in violation of the federal Constitution as a regulation of interstate commerce."—*R. Rasmussen v. State of Idaho,* 181 U. S. 199, 21 Sup. Ct. 594, 45 L. Ed. 820.

While the legislation under discussion is not a local, but a general, law, many of its provisions can be in effect only in limited portions of the state at the same time, and the provisions of the law of which the appellee complains cannot apply to all stock in the state, or to all places in the state, but only to diseased or infected stock, or to diseased or infected places. The powers, therefore, conferred upon the board can only be exercised by them in the sections of the state which have been placed under quarantine. While there may exist some

conflict among the authorities as to the constitutionality of such legislation, the great weight of authority unquestionably upholds it as coming within the scope of the police powers of the state, without the exercise of which, in the manner provided for in the statutes under consideration, the state would, in large measure, be helpless to effectuate the purpose for which it was designed. "Constitutions were made for practical purposes, and not for the exercise of critical gymnastics; they should be construed so as to carry out the intention of the makers, which should be reasonable rather than absurd."—*State v. Thompson,* 142 Ala. 98, 38 South. 619.

Certainly, under the decisions of the Supreme Court of Alabama which we have above quoted, as well as upon reason and the great weight of authority, we must hold that the statutes under consideration are constitutional; and that the court below erred in sustaining the demurrer to the affidavit, upon the ground that they were offensive to the Constitution.

It follows, from what we have above said, that, in our opinion, the trial court erred in sustaining the demurrer to the affidavit, upon the ground that the acts referred to were repugnant to our Constitution, and that they are therefore void.

The judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.


On Application for Rehearing.

In the above opinion this court, accepting the appellee's demurrer as broad enough to challenge the validity, on constitutional grounds, of each of the subdivisions of the present Code from 757 to 770, inclusive, held that none of said subdivisions were unconstitutional.

.The appellee, when he demurred to the complaint, fixed the invalidity of the above statutes as the basis of his right to a discharge from the prosecution, and the question as fixed by him was the only question which we were authorized to review.—*State v. Street, et al.,* 117 Ala. 203, 23 South. 807. On this application for a rehearing, appellee switches this discussion in large measure from a consideration of the above statutes to a discussion upon constitutional grounds, of the validity of an act entitled "An act to amend section 770 of the Code," approved August 20, 1909 (see Pamphlet Acts Special Session 1909, p. 61), and of the validity of an act entitled "An act to amend an act to establish a State Live Stock Sanitary Board," etc., approved August 26, 1909. See Pamphlet Acts Special Session 1909, p. 187.

It is evident that the above amendatory acts can in no way affect the validity of the above sections of the Code. If they are invalid, the Code provisions remain in the conditions they were in before the amendatory acts were adopted.

We undertook, in the above opinion, to call attention to the fact that the legislation under discussion comes within that class of legislation concerning which courts exercise the broadest liberality. Quarantine regulations affect the state in its most vital spot—the health of its people, or, as in this case, the health of its live stock— and it is essential that, in construing statutes passed for the purpose of promoting such delicate and important subjects, great latitude should be allowed the Legislature in determining the character of such laws, and how, when, and by whom, in their practical administration, they should be applied.—*Blue v. Beach,* 155 Ind. 121, 56 N. E. 89, 50 L. R. A. 64, 80 Am. St. Rep. 195; *Union Bridge Co. v. U. S.,* 204 U. S. 364, 27 Sup. Ct.

15 CA

367, 51 L. Ed. 523; *St. Louis Merchants' Bridge Terminal Co. v. U. S.,* 188 Fed. 191, 110 C. C. A. 63.

The mere fact that, under section 765 of the Code, the county commissioners of a county are authorized, when the work of cattle tick eradication is undertaken in a county, to supplement, out of the funds of the county, the fund provided by law for that purpose in no way effects the validity of the acts, or any one of the acts, under consideration. The provisions relative to county commissioners can be striken from the act, and the act still remain.—*Royal Exchange, etc., v. City of Montgomery, Infra,* 59 South. 508.

Neither are we able to assent to the proposition that section 765 of the Code violates any of the provisions of our Constitution, because it provides that the work of "cattle tick eradication * * * *shall* be taken up under the provisions of this act in *any* county or *any* part of a county, or *any* part of the state of Alabama, when the *State Live Stock Sanitary Board* may deem it best." This section is mandatory in its terms. It provides that the law "shall" go into effect, and leaves it to the discretion of the board as to *when* it shall go into effect in a particular county, part of a county, or a particular part of the state. The contingency that the law "shall" go into effect in a particular county, or a particular part of a county, or a particular part of the state, at a particular time, is that the board "shall deem it best" that the work which the law requires to be done shall be done in such county, part of a county, or part of the state at that time. "The rule is familiar that a statute may be made to take effect on the determination of some fact or state of things on the part of the people, or a municipality, or other body of officers."—6 A. & E. Ency. Law, p. 1032; *People v. Burr,* 13 Cal. 358; *Haney v. Barton County,* 91 Ga. 770, 18 S. E. 28.

[State v. McCarty.]

It is, of course, a matter of common knowledge that Texas fever—a communicable and dangerous cattle disease—is prevalent in every county in Alabama, and that the cause of the disease is the cattle tick.  Wherever the cattle tick is found, there Texas fever is found; and where there are no cattle ticks there is no Texas fever. Texas fever and cattle ticks go hand in hand; where one exists there the other, ex necessitati, also exists.

Scientists, having made the above discovery, busied themselves in ascertaining a method of destroying the tick, and finally discovered a method whereby this can be successfully and economically done.  It takes time, labor, constant watchfulness, and supervision by experts for this work to be accomplished.  Each animal and each pasture requires attention and supervision; and means have to be provided for the cleaning of each animal in a herd, until Texas fever has been eliminated from that herd, and the tick and the cause of it removed from the pasture or inclosure occupied by the herd.  It is therefore impossible for the work of cattle tick eradication (and by that means the elimination of Texas fever from the state) to be undertaken in all parts of the state, or in all of the counties of the state, at the same time.  Section 760 of the Code *requires* the state veterinarian to *quarantine* (and by that means cut off as a source of infection) any "stall,  *  *  *  city, township, county or any part of the state, when he shall determine that live stock in such places are  *  *  * infested or infected with the carrier or carriers of a contagious, infectious or communicable disease."  Undoubtedly the cattle tick is a carrier of a contagious, infectious, or communicable disease; and cattle and places infested with cattle ticks are covered, therefore, by the express provisions of the above section.  Section 763 of the Code *requires* the owners, etc., of live stock

or places quarantined under the provisions of said section 760 to *cleanse* and *disinfect* such live stock and places under the direction of the Live Stock Sanitary Board.

As, however, the *eradication* of the tick, and by it the stamping out of Texas fever, cannot be done in all parts of the state at one time, we think that the Legislature wisely and validly declared that the work of the eradication of the tick *shall* be taken up "in any county, or any part of a county, or any part of the state, when the Live Stock Sanitary Board shall deem best." As the board is placed in charge of the work all over the state, and as it is an impossibility for this work, under the supervision of the board, to be done, under present conditions, all over the state at one time, it was entirely competent for the Legislature to leave it to the board to say when, in their administration of the law, it was feasible for the work to be done in a particular county or section.—*U. S. v. Grimaud,* 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; 6 A. & E. Ency. Law, 1029 (f), and authorities cited; *Turner v. City of Detroit,* 104 Mich. 326, 62 N. W. 405; *People v. Brooks,* 101 Mich. 98, 99 N. W. 444; *State v. Rasmussen,* 7 Idaho, 1, 59 Pac. 933, 52 L. R. A. 78, 97 Am. St. Rep. 234; *R. Rasmussen v. State,* 181 U..S. 199, 21 Sup. Ct. 594, 45 L. Ed. 820; *Ingram v. State,* 39 Ala. 247, 84 Am. Dec. 782; *Locke's Appeal,* 72 Pa. 491, 13 Am. Rep. 716; *Isenhour v. State,* 157 Ind. 517, 62 N. E. 40, 87 Am. St. Rep. 228; *Dunn v. Wilcox County,* 85 Ala. 144, 4 South. 661; *Whaley v. State,* 168 Ala. 152, 52 South. 941, 30 L. R. A. (N. S.) 499.

The case of *Dunn v. Wilcox County, supra,* it seems to us, conclusively settles the question as to the validity of the act approved August 26, 1909 (Pamphlet Acts Special Session 1909, p. 187), above referred to by us, against the contentions of appellee.

The application of appellee for a rehearing is over-ruled.

Application overruled.